## The People of the State of Illinois, Defendant in Error, v. Hiram Gilmore, Plaintiff in Error.

### Gen. No. 6,072.

1. CRIMINAL LAW, § 409*—*when entry of judgment on some counts does not oust jurisdiction of remainder.* Where, in an indictment containing eleven counts, defendant pleaded guilty to the first three counts and was fined thereunder and paid the fine in open court and thereupon the State's Attorney dismissed all the remaining counts except the eleventh, and thereafter, on the same day, the defendant and the State agreed in writing that the cause should be heard upon a stipulation as to the facts which was that day filed in the cause, such stipulation signed by defendant personally and by the attorneys for both parties containing the following language, "It is hereby stipulated and agreed * * * that said cause shall be and it is hereby submitted * * * upon the following agreed facts, the

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The People v. Gilmore, 196 Ill. App. 148.

eleventh count in the indictment being the only count in the said indictment for trial in this cause," and the cause proceeds to trial and judgment is rendered thereupon without raising the question of the court's jurisdiction to try defendant on such count after entering judgment on the earlier counts, defendant cannot on appeal for the first time question the jurisdiction of the trial court.

2. APPEAL AND ERROR, § 1713*—*when assignment of error waived.* A question which is not argued or suggested in the opening brief of plaintiff in error cannot be raised for the first time in a reply brief, but is waived.

3. APPEAL AND ERROR, § 831*—*when bill of exceptions to be taken and filed.* A bill of exceptions must be taken at the time the event referred to occurs unless an order is obtained from the court extending the time, and must then be presented within the time of the extension.

4. INTOXICATING LIQUORS, § 147*—*when evidence sufficient to support conviction.* Evidence on an indictment for the sale of intoxicating liquors in violation of law, examined and *held* to support conviction.

NIEHAUS, J., dissenting.

Error to the County Court of De Kalb county; the Hon. DAVID T. SMILEY, Judge, presiding. Heard in this court at the April term, 1915. Affirmed. Opinion filed October 20, 1915.

ALSCHULER, PUTNAM & JAMES, for plaintiff in error; THOMAS M. CLIFFE, of counsel.

LOWELL B. SMITH, for defendant in error; E. M. BURST, of counsel.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

On October 31, 1914, the grand jury of DeKalb county returned into the Circuit Court an indictment against Hiram Gilmore, containing eleven counts, wherein he was charged with various offenses against the liquor laws of this State. The indictment was certified to the County Court for process and trial. There was a change of venue from the county judge, and the county judge of another county tried the case. Gil-

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

more pleaded guilty to the first three counts of the indictment and was fined thereunder and paid the fine in open court. The State's Attorney dismissed the remaining counts except the eleventh. Gilmore pleaded not guilty. A jury was waived. A stipulation as to the facts was prepared and signed by the State's Attorney and by Gilmore and by his attorneys, in which stipulation he waived various questions. The cause as to said eleventh count was tried by the judge without a jury upon said stipulation. Gilmore was convicted of maintaining a nuisance as charged in the eleventh count, and was sentenced to pay a fine and to a short imprisonment, and it was further adjudged that the place so kept as a common nuisance be abated until Gilmore should give a bond, with security approved by the court, in the penal sum of $1,000, conditioned that he would not sell intoxicating liquors contrary to the laws of the State, and would pay all fines, costs and damages assessed against him for any violation thereof. This is a writ of error to review that judgment.

In his reply brief, Gilmore contends that when the court had entered judgment under the first three counts of the indictment it possessed no jurisdiction to try him thereafter under the eleventh count. The course pursued was in harmony with the views expressed by this court in *Gaul v. People,* 136 Ill. App. 445. That judgment was reversed by the Supreme Court in *People v. Gaul,* 233 Ill. 630. Gilmore relies upon the latter decision as requiring the reversal of the present judgment. There are several answers which we deem sufficient. This point was not raised in the trial court. According to the record before us, Gilmore pleaded guilty to the first three counts of the indictment, and was fined thereunder and paid the fine in open court, and the State's Attorney dismissed all the remaining counts except the eleventh, all on January 26, 1915, and thereafter on the same day Gilmore executed and filed in the cause a waiver of a trial by jury and submit-

ted the caused to trial by the court without a jury, and both parties agreed in writing that the cause should be heard upon a stipulation as to the facts which was that day filed in the cause. The stipulation, signed by Gilmore personally and by the attorneys for both parties, contained the following language: "It is hereby stipulated and agreed * * * that said cause shall be and it is hereby submitted * * * upon the following agreed facts, the eleventh count in the indictment being the only count in the said indictment for trial in this cause." The cause was tried on February 20, 1915, and Gilmore was then found guilty under the eleventh count, and the judgment here assailed was then rendered. After entering into that stipulation and being tried thereunder without raising this question, we are of opinion he cannot be heard to say in this court for the first time that the previous entry of judgment under the first three counts makes the trial under the eleventh count without jurisdiction. This point is not raised by the assignment of errors in this court, except in language so general that it could not indicate the point to counsel for the People. It was not argued or even suggested in Gilmore's original brief, and thereby we are deprived of any answer which the People might make. Because it was not argued in the opening brief of Gilmore it was waived by him. This is established by many decisions which we need not cite. The time for filing a reply brief was extended, and the extended time expired July 1, 1915. The reply brief, in which this point was raised for the first time, was placed in the hands of the clerk on July 22nd, long after the time for filing reply briefs had expired, and Gilmore never obtained an extension of that time or a leave to file reply briefs after the time had expired, and the reply briefs have not in fact been filed. Aside from that, we do not think Gilmore should be permitted to raise so important a question for the first time after the brief of the other side has been filed. If technicalities are

to be brought in after the time for filing even reply briefs has passed, we suggest to Gilmore's counsel that there is not in this record, which is certified to be complete, any leave to present a bill of exceptions after the rendition of the judgment. The bill was signed on March 4, 1915, some time after the judgment. It is, we believe, established law that a bill of exceptions must be taken at the time the event referred to occurs, unless an order is obtained from the court extending the time, and then it must be presented within the time of that extension. This record contains neither leave to present a bill of exceptions nor any extension of the time to present it beyond the day of judgment.

The statement of facts contains 24 typewritten pages, besides numerous exhibits. The place described at length in the eleventh count is the first story of a building known as 352 West State street, in the City of Sycamore. Gilmore was a tenant of said first floor until July 1, 1914. That territory was what is known as wet territory until May 7, 1914, and Gilmore kept a saloon therein until that time under a license so to do. He had not only sold liquors at retail there but also sold liquors at wholesale in said City of Sycamore from that place, and he owned a team and wagon with which to deliver liquors bought at wholesale, and had in his employ a driver named Hurley. Gilmore bought all his beer of the Aurora Brewing Company, hereinafter called the brewing company, whose plant was in the City of Aurora, in Kane county, thirty miles distant from Sycamore. Aurora is wet territory. On May 7, 1914, the town of Sycamore, which included said City of Sycamore, became anti-saloon territory under the statute of this State on that subject (J. & A. ¶ 4637 *et seq.*), and has ever since so remained. About August 1, 1914, the brewing company obtained a lease of said first floor of said building in Sycamore and a club was organized in Sycamore and named the "Sycamore Social Club," which at first had twelve members, and at the

time of this indictment had one hundred members. It has in its rooms chairs, settees, tables, newspapers and magazines, lockers for beer and an ice chest previously used in the saloon and intended to cool beer. The brewing company had owned the fixtures in the saloon, and they still remained in the same room when this indictment was returned, but the ordinary bar equipment was not used by the club. The brewing company put in a partition cutting off the front part of this building from two rooms in the rear. One Rupp had been district manager at Aurora for the United States Express Company for many years, until it retired from business in the spring of 1914. About July 1, 1914, Rupp reorganized an express company known as the Fox River Express Company, and hereinafter called the express company. He became manager of the express company, and an employee of the brewing company became its president. The brewing company had a downtown branch office at 82 New York street, Aurora, and had a lease of that building. It sublet one room in that building to the express company, and the express company used it as its main office. The collections of the brewing company were made from that building, and this employee who became president of the express company was also collector for the brewing company and did that business in the same building. Both names, that of the brewing company and that of the express company, were on the same front door which constituted the only front door of admittance to the building. The front room of said building in Sycamore was made an office of the express company, and Gilmore was made its agent at a salary of $75 per month. Gilmore took an active part in organizing said club, and became its treasurer and handled all its moneys. The brewing company leased the two rear rooms to the club. These two rooms included most of what had been the saloon. Hurley, Gilmore's former driver, was made custodian of the clubrooms, and Gil-

more assisted Hurley in that work. Gilmore collected an initiation fee of fifty cents from each member, which was used for the purpose of buying such member a key to the door from the express office into the club and a padlock and key to a locker inside the club. Gilmore collected dues of twenty-five cents per month in hot weather and thirty-five cents per month in cold weather from each member. He paid the rent, the janitor service, the bills for lighting and heating and ice, and at the time of this indictment had never made any report to the club of his receipts or disbursements. Gilmore sold his team and wagon used by him in the wholesale liquor business in Sycamore to the express company, and Hurley, formerly his employee, became the driver of said conveyance for the express company. In said front room used as the office of the express company, Gilmore sold cigars, tobacco and snuff, and there were upon its counters blank orders addressed to the brewing company for beer. These orders were also to be found inside the clubrooms. A person, whether a member of the club or not, wishing to order beer by the case, filled out a blank, specifying the amount of beer required and the price, and signed it and bought from Gilmore an express money order for that amount, with twenty-five cents added thereto for the charges of the express company for conveying each case of beer, and paid three cents for the money order, and put the order for the beer and the money order in an envelope. Envelopes already addressed to the brewing company at Aurora were always upon these counters, and were generally but not always used. After the envelope had been sealed, Gilmore sold the party a postage stamp if he was not supplied with one. The parties could take this envelope to a United States mail box if they desired, but there was a private mail box inside this room in which the orders were generally placed. Whenever he saw fit, Gilmore called a United States mail carrier to come and take out the orders in the box, and

this was done. When the order was received by the brewing company at Aurora, it entered it on its books, and caused a case or cases, as ordered, to be duly marked with the name and address of the person who signed the order, and if that person was a member of the club the address was 352 West State Street, Sycamore, Illinois. This case or these cases were then placed upon the shipping platform of the brewing company at Aurora, and taken by the express company and carried to Sycamore, sometimes with their auto trucks and horses and wagons, but more generally over the Northwestern Railroad. The shipment was then placed in a warehouse at Sycamore which the brewing company owned and used until this became dry territory, and then leased to the express company, and Gilmore or Hurley then hauled the shipment to the club, if it was ordered by a member, and to the residence of a consignee who was not a club member. Gilmore then opened the case of the club member and placed the bottles in the locker belonging to the member whose name had been signed to the order. It would seem, therefore, that he had a key to each of these lockers. There was only one door of entrance to the clubrooms and that was from the front office. It was locked, and bore a sign "For members only." Each member had a key to that door. When a member had ordered beer which had been placed in his locker and he wished a drink, he opened his locker and took out one or more bottles. There was in the old saloon an ice chest which still remained there when these became clubrooms. It had two compartments, one marked "Hot" and the other "Cold." The member would take his bottle and place it in the side marked "Hot" and then would open the side marked "Cold" and take out a bottle. The rules of the club required that each member should mark on his bottle, when he took it out of his locker, the number of his locker, and it was intended by the rules of the club that when he took a bottle or bottles out of the cold side of the ice chest he should only take

bottles bearing his number on the cap, placed there by himself. This part of the arrangement, however, failed. The members did not put the numbers of their lockers, respectively, on their bottles of warm beer. The ownership of each bottle therefore could not afterwards be ascertained, and when a member put a bottle into the hot side of the ice chest he put it into the common stock, and when he drew a bottle from the other side he had no means of knowing that he was taking beer which he himself had paid for, but he was drawing a bottle merely from a common stock, and all efforts to keep them separate by having separate bottles in individual lockers ended when a bottle was placed in the ice chest. Thereafter the members simply used beer from the common stock. It is admitted in the stipulation that the beer was intoxicating liquor. Neither Gilmore nor any one else had any license to sell liquor at that place. No United States license or internal revenue tax receipt had been obtained for the place. Members were permitted to enter it at all times from seven o'clock in the morning until eleven o'clock at night of each day, including Sunday. There was a membership committee of three, who were also the board of directors. No one could be admitted a member except by the consent of two of those three. Gilmore was a member of that committee. The applications were generally made to Gilmore, and he generally admitted the member at once, but sometimes he required the party to wait a day or two until he consulted the others, and some persons were rejected who had applied for membership. Gilmore and others frequently invited persons to become members who had not made application. The brewing company charged the members of this club more for its beer than it did other people. At first this seems strange. If, as contended, the only connection the brewing company had with this matter was that it received at Aurora by mail an order for one or more cases of beer

to be consigned to a certain party in Sycamore, and, with the order, received pay in full for the beer and the charges for transportation, and all it then had to do was to mark the cases with the name of the consignee and place them on its shipping platform, and its connection with the matter was then ended, no reason is perceived why it should charge the members of this club more than other customers. A computation of the expenses of the club as stipulated and of the dues which the members were to pay will show that the income from the members was less every month than the expenses of the club, even after it had one hundred members, and must have been much less when the membership was smaller. The monthly expenses of the club were $30 or more in warm weather and $35 or more in cold weather. When it had twelve members its receipts from dues, its sole income, was $3 per month, and when it had fifty members its income was $15 per month in warm weather and $17.50 per month in cold weather. At the time of this indictment its monthly income was $25 in warm weather and $35 in cold weather. If that loss in some way fell upon the brewing company, then a reason would appear why the brewing company should charge the club more for its beer. The express company not only has its office in a part of the brewing company building but it does very little business except to transport the beer of the brewing company, and four-fifths of the towns to which it conveys the beer of the brewing company are dry territory. It transports no beer except that of this brewing company. All the beer this brewing company ships into dry territory it ships by this express company. The by-laws of the express company reserve a right to reject any and all shipments. The express company has all the legal forms of organization of a common carrier. The provision that it may reject shipments is probably void if the question arose between the express company and a person who offered shipments

which it refused, but it is a circumstance having some bearing upon the question what the real relations were between the brewing company and the express company and Gilmore and the club. It tends to show that the express company intended in advance to reject general shipments and intended to accept little business except that of the brewing company, and prepared this by-law to discourage general shipments, and to enable it to justify the rejection of other shipments. No stockholder or officer in the brewing company owns any stock in the express company. Each company had forms and blanks and books indicating that each had a separate organization and business life.

The first sentence of section 12 of the act for the creation of anti-saloon territory (Hurd's Rev. St. 1913, p. 1028, J. & A. ¶ 4648) is as follows: "Whoever shall, by himself or another, either as principal, clerk or servant, directly or indirectly, sell, barter or exchange any intoxicating liquor in any quantity whatever, within the limits of any political subdivision or district in this state, while the same is Anti-Saloon Territory, shall be fined not less than twenty dollars ($20), nor more than one hundred dollars ($100), or imprisoned in the county jail for not less than ten (10) days nor more than thirty (30) days, or both, in the discretion of the court."

Section 13 (J. & A. ¶ 4649) is as follows:

"The giving away or delivery of any intoxicating liquor for the purpose of evading any provision of this act, or the taking of orders or the making of agreements, at or within any political subdivision or district while the same is Anti-Saloon Territory, for the sale or delivery of any intoxicating liquor, or other shift or device to evade any provision of this act, shall be held to be an unlawful selling."

The general dramshop act contains similar provisions in regard to shifts and devices to evade the provisions of the act. These provisions in regard to a

shift and a device have been considered and construed in Illinois in the following cases: *Rickart v. People,* 79 Ill. 85; *People v. Law and Order Club,* 203 Ill. 127; *South Shore Country Club v. People,* 228 Ill. 75; *People v. Gardt,* 175 Ill. App. 80, and 258 Ill. 468; *City of Decatur v. Schlick,* 269 Ill. 181; and *People v. Craig,* 155 Ill. App. 73. As the discussion of a shift and a device in those cases is accessible to the profession, we need not repeat the various schemes to evade our liquor laws which the courts there held to be mere shifts and devices. There are, in various other States of the Union, like statutory provisions, and like decisions covering many different kinds of schemes intended to enable the parties resorting thereto to avoid the penalties of legislation of this character, and which have almost uniformly been held by the courts to be mere shifts and devices. Very many of the features that are prominent in the arrangement here adopted will be found in some of those cases.

We will briefly restate the relation between the brewery and the express company and the club, so far as it is revealed by the evidence. This defunct express company was not revived until the anti-saloon territory act had become effective in Sycamore at least, and, it is a fair inference from the language of the stipulation, in other cities, and villages in northern Illinois. Its president is an employee of the brewing company. It has its main office in Aurora in a room which it rents from the brewing company in a building the rest of which is occupied by the brewing company, and said president of the express company works for the brewing company in that building. There is but one front door of entrance into the downtown office of the brewery in Aurora and the main office of the express company, and the names of both companies are on the front door. The express company bought part of its horses and trucks from the brewing company. The brewing company owns a warehouse in Sycamore

for the storage of beer, which was used by it for that purpose until Sycamore became dry territory. Soon after it became dry territory, the brewing company leased this warehouse to the express company. Gilmore operated a saloon in the first floor of a building in Sycamore until this became dry territory. Soon thereafter the brewing company rented the first floor of that building. Gilmore at that place had sold at retail and wholesale the beer of this brewing company exclusively. Hurley was his driver to carry cases of beer from the warehouse about the town. When this became dry territory the express company bought from Gilmore the truck and team so used in Sycamore, and hired Hurley as its driver. Gilmore took an active part in the organization of the club. He became its treasurer, and handled all its money. Hurley and he performed the duties of custodian of the clubrooms. Gilmore actively exerted himself in procuring men to join the club. He sometimes hauled the beer from the warehouse to the club, and if Hurley hauled it, Gilmore received it at the club. He usually placed the beer ordered by each member in the locker of that member. He must necessarily have had a key to each of the one hundred lockers in order to enable him to do that. He pays the rent and the charges for lighting and heating and ice and janitor services. He shows each person who wishes to order a case of beer how to do so, if he needs assistance, sells him the money order for the price of the beer and the express charges, and receives the money. He directs the inclosure of the money order and the order for the beer in an envelope, to be placed in a private box inside the front room of the building, and tells the mail carrier when to come and get it and take it away. He is one of the three members of the membership committee, and two of said members can determine who shall be received as a member. It is impossible but that he and Hurley have obtained for membership in said club many of

the regular patrons of his former saloon. The stipulation does not tell on what grounds persons who applied for membership have sometimes been refused, but the fact that the only revenue to be received there either by the express company or the brewing company must arise from the sale of beer would furnish an incentive to admit persons who were likely to be considerable consumers of beer and to be able to pay in advance therefor. Very likely they might reject persons whose presence in the club would be undesirable. The stipulation contains the following: ''No intoxicating liquor of any kind has been carried, stored or delivered by. said Fox River Express Company or by said defendant as its agent which has not been ordered by an order mailed as above set forth from dry territory into wet territory, nor has any liquor been carried, stored or delivered by said express company or said defendant as its agent which has not been labeled with the name of the purchaser and delivered to said Fox River Express Company by the seller in wet territory.'' Strictly considered, this language means that the Fox River Express Company has not carried, stored or delivered any intoxicating liquor except on orders mailed in dry territory, and if that is its meaning, then the sole business of this express company, so far as it relates to liquor, has been to take liquor into dry territory and deliver it there. Other portions of the stipulation show that only four-fifths of the towns to which it carries the brewing company's beer are dry towns. It is clear that the express company has very little business except carrying intoxicating liquor from this brewery into dry territory, and it is stipulated that it carries no intoxicating liquor except the beer of this brewing company. This express company has not the indicia of an ordinary express company seeking general business. It has a rule which permits it to refuse any shipment that it does not wish to take.

It has shipped nothing into Sycamore except intoxicating liquor and some cases of mineral water.

The court is of opinion that if these facts were considered by a well-informed person who was neither juror nor judge, he would say at once that this was a system which had been devised to enable the parties to put the beer of the brewing company into dry territory and into places where men congregated to drink it, and to give it the legal appearance of an order for liquor received, filled and delivered to a common carrier in wet territory. Why should a juror or judge take any other than such common and reasonable view of the real nature of this business arrangement? This club is substantially the saloon which Gilmore previously kept there. If its rules are strictly carried out, a stranger on the street could not go in and get a glass of beer at once, but he would have to be passed upon by two members of the membership committee, and wait two or three days for an order for beer to reach Aurora and for the beer to be returned. But for all the regular habitues and friends and customers of Gilmore it possesses practically the same opportunities, and it is just as feasible and just as lawful on Sunday as any other day, and it pays no revenue to the State. True, each member has to help himself to liquor, but this is an unimportant detail. This is a place where those who are willing to be the customers of Gilmore meet from seven a. m. to eleven p. m. of all the days of the week, to drink intoxicating liquor which they obtain through the assistance of Gilmore and others. The plan is artfully devised, but we entertain no doubt that it is a scheme or device to avoid the liquor law. If this can be done in this saloon building by Gilmore, it can be done in every other place in Sycamore which was a saloon before the territory became dry. If this can be lawfully done in Sycamore and by this brewing company, it can also be done in all other dry territory in this State by every other brewery and distillery, and

the statute in question can be practically defeated. We are of opinion that this express company is not a real express company, but it is a part of a device and agency of the brewing company to deliver its beer in Sycamore and other dry territory; that its receipt of orders and money in Sycamore and delivery of beer in Sycamore is really the act of the brewing company, done in Sycamore, and that Gilmore, who receives the original money and who delivers the beer, is really an agent of the brewery company, and is violating this statute in dry territory.

If, however, this be treated as a genuine express company, and the beer be considered as delivered by the brewing company to the consignee in Aurora, nevertheless it appears from this stipulation that when a member places his bottles in the hot part of the ice box he does not place the number of his locker · thereon, and therefore they are immediately merged in the common stock placed by the members in that side of the ice box, and when he takes bottles out of the cold side of the ice box he has no means of knowing that he is taking out his own bottles, but he is merely taking bottles from a common stock. The having of liquor in a common stock in a club has been held a shift or device, and invalid. (*People v. Law & Order Club, supra; South Shore Country Club v. People, supra*); and it cannot be but that Gilmore, who takes the money, directs when the order therefor shall be mailed, receives the beer and puts it in the locker, and who assists the custodian in charge of the room, and who is in effect the manager of the club, knows that the liquors there drank are taken out of a common stock, and knows that this is not a case where each man actually drinks the liquor which he himself purchased. For that reason also he is a violator of this statute.

Since the foregoing opinion was prepared, the Supreme Court has denied a rehearing in the four cases consolidated as *City of Decatur v. Schlick, supra.*

We therefore wish to call attention to the facts that the City of Decatur was dry territory, that the ordinance there involved contained practically the same provisions as the act for the creation of anti-saloon territory, and that in those cases the defendants who were held rightfully convicted of violating the provisions of the ordinance did not own the liquors there used at the clubs there described, or have any interest in said liquors. Each member of those clubs bought his liquors elsewhere and had them delivered at his club. The defendants merely received and kept the liquors and served to each member his own liquor which he had bought and paid for elsewhere. The places had been saloons kept by the defendants before the territory became dry, and after it became dry they only kept and served to each member his own liquor. Defendants did not buy or order the liquor or handle any money spent for liquor. They only stored and served the liquor. They were paid only for such service. Yet it was held that they were violating the provisions of section 15 of the ordinance (which was the same as section 13 of the Act), in the delivery to the consumer of intoxicating liquors for the purpose of evading the provisions of the ordinance, and in making agreements for the delivery thereof; and that their methods of conducting the business were shifts and devices which authorized their conviction for unlawful selling. The application of the principles there stated to the facts of this case seem to us to fully justify the judgment here presented for review.

Under section 14 of the Anti-Saloon Act (J. & A. ¶ 4650), the place where the law is thus violated is a common nuisance and may be abated as such, and the judgment of the court below is therefore authorized by the law and the evidence. The judgment is affirmed.

*Affirmed.*

MR. JUSTICE NIEHAUS, dissenting.

I am unable to concur in the decision of the court affirming the judgment of conviction of the plaintiff in error. Plaintiff in error is charged with unlawfully keeping a certain place, namely, the first floor of a building situated at No. 352 West State Street, in the City of Sycamore, in the Township of Sycamore, which is anti-saloon territory, and unlawfully selling intoxicating liquor there, whereby the place became a common nuisance. The guilt of the plaintiff in error is to be determined from certain facts which are stipulated, and the stipulated facts should furnish the proof of guilt. I am of opinion that they do not show that the plaintiff in error actually or constructively sold any liquor in the place in question, nor that he was the keeper of the place. The liquor handled in this place was beer, and it is perfectly clear that this beer was purchased and owned by individual members of a certain club, known as the "Sycamore Social Club." At the time of the indictment, the club had about one hundred members, and was composed of farmers, business men, masons, contractors, former saloon keepers, laborers, factory workers and others. Individual members of this club purchased beer in bottles and by the case from the Aurora Brewing Company at Aurora, in Kane county, a locality which is admitted to be wet territory. This beer, when purchased, was consigned by the brewing company to the several members of the club, who were purchasers, and delivered to the Fix River Express Company, at Aurora, for the consignees at DeKalb. It is conceded that the Fix River Express Company is an Illinois corporation, organized for the purpose of carrying on a general express, transfer and cartage business, and chartered to do business as a common carrier, and doing business as such carrier in the counties of Kane, Winnebago, Boone, McHenry, Ogle, Whiteside, Lee, DeKalb, DuPage, Will, LaSalle, Grundy and Kendall. As such carrier it not only had the right, but was legally obligated to transport

the goods received from the Aurora Brewing Company, even though they were intoxicating liquors, to the consignees at Sycamore, and to transfer them into their possession. The plaintiff in error is the agent of this express company at the Sycamore end of the line; and he handled this beer, which was the beer of the several consignees, as such agent, to put the consignee into possession of the property which the company had transported for them.

It also appears from the stipulation that the Fox River Express Company occupied the front room of the first floor of the building in question, and that the "Sycamore Social Club" occupied the room adjacent, which was the rear room; that is, the express company had possession as tenant of a room which was a part of the first floor of the building in question, and the "Sycamore Social Club" was in possession as tenant of the other room on this floor; and I am unable to see how the plaintiff in error could be held to be guilty of keeping a place, and conducting a nuisance therein as a matter of law, when, as a matter of fact, the place was kept and maintained by other parties. Nor does it appear to me to be material to the issue here, how the ice box, used by the members of the club, was constructed, nor the manner in which members iced their beer; nor is it any evidence of the guilt of the plaintiff in error that the members of the club were careless in marking their beer bottles; nor, that by their carelessness in that regard, they sometimes got their bottles mixed; nor is it any legitimate evidence of the guilt of the plaintiff in error, of the charge upon which he was tried, that before he became the agent of the Fox River Express Company, and before the club occupied the premises mentioned, he had conducted a saloon, illegally sold liquor in these premises, and pleaded guilty to such illegal selling; nor are these facts embraced in the stipulation.

It is true the plaintiff in error sold express money orders, as agent of the Fox River Express Company, in the usual course of his employment as agent of the company, and knew that the express orders, which he sold to the members of the club, would be used by them in the purchase of beer from the Aurora Brewing Company; but as these purchases of beer were to be made in wet territory, this did not involve a violation of law; and it is also clear that the plaintiff had no interest whatever in such purchases, either directly or indirectly. If there is any shift or device involved in this case, it does not appear to be one carried on by the plaintiff in error. In my opinion the stipulation of facts does not show that the plaintiff in error is guilty of the offense with which he is charged, and the judgment of conviction should, therefore, be reversed.